# United States Court of Appeals

FOR THE EIGHTH CIRCUIT

_____

No. 96-3934

_____

Scott Manatt, Sr., individually and as,        *
father of Scott Manatt, Jr., now      *
deceased, and separately in his      *
capacity as personal representative    *
of the estate of Scott Manatt, Jr., now     *
deceased; Sharon Manatt, individually  *
and as mother of Scott Manatt, Jr., now  *
deceased; Mitzi Manatt, individually   *
and as surviving sister of Scott Manatt,   *
Jr., now deceased; Yvette Manatt,     * Appeal from the United States
individually and as surviving sister of    *    District Court for the
Scott Manatt, Jr., now deceased,    * Eastern District of Arkansas.
                                 *
           Appellants,       *
                                 *
         v.                  *
                                 *
Union Pacific Railroad Company, a,     *
foreign corporation; National Railroad  *
Passenger Corporation, a corporation   *
created and doing business under the   *
Rail Passenger Service Act of 1970,    *
also known as Amtrak National       *
Railroad Passenger Corporation,       *
                               *
           Appellees.      *

_____

Submitted:  June 11, 1997

Filed:  August 5, 1997

_____

Before WOLLMAN, Circuit Judge, HENLEY, Senior Circuit Judge, and BEEZER, Senior Circuit Judge.[1]

_____

HENLEY, Senior Circuit Judge.

On October 5, 1993 at about 4:30 a.m., nineteen-year old Scott Manatt, Jr. (Scott) was killed when he was hit by an Amtrak train while he was on railroad tracks near a crossing in Corning Arkansas.  His father, Scott Manatt, Sr., and other family members (collectively referred to as Manatts) appeal from a judgment of the district court[2] entered on a jury verdict in their wrongful death action in favor of Amtrak and Union Pacific Railroad Company (UP), the lessor of the railroad tracks.  We affirm.

The evidence viewed in a light most favorable to the jury's verdict reveals the following.  Around 9:00 or 10:00 p.m. on the night before the accident, Scott and Angel Lane went to Mark Gearhart's house.  According to Gearhart, Scott had been taking drugs and had been depressed for about two weeks and was "messed up pretty good" that evening.  Nonetheless, Gearhart and his wife rode around town with Scott and Angel.  During the evening, Scott drank two or three beers and took some pills.   In the

_____

[1]The Honorable Robert R. Beezer, United States Senior Circuit Judge for the Ninth Circuit, sitting by designation.

[2]The Honorable James Moody, United States District Judge for the Eastern District of Arkansas.

early morning hours, the car veered off the road and got stuck in a ditch about a mile from a rail crossing. The women went for help, but Scott and Mark decided to walk down the tracks to the crossing. As they walked, Scott talked about committing suicide. Scott then sat on the side of the tracks and covered himself with a sheet. Gearhart saw a train coming and told Scott to get up. Gearhart walked off the tracks, but Scott continued sitting on the side of the tracks. As the train approached, the train's engineer, B. D. Wilder, saw what appeared to be a plastic or paper wrapping on the tracks, which was about ten to twenty feet south of the crossing. When Wilder got closer, he saw a hand reach out from underneath the wrapping and immediately put on the emergency brake, but it was too late. As Gearhart looked back, he saw the train hit Scott. An autopsy toxicology report indicated that Scott had taken Valium and methamphetamine, which, in the opinion of a toxicologist, would have impaired a person's ability to recognize and avoid danger.

In support of the wrongful death action, Manatt, Sr. testified that a week after the accident, he went to the rail crossing and found a gap between the crosstie and the rail. Because Scott's pant leg had a creosote mark on it and his leg had been broken, Manatt believed that Scott's foot must have gotten caught in the gap, thus preventing escape from the oncoming train. Two other witnesses testified about the gap. Ben Williams, owner of the land at the crossing and a friend of the Manatt family, testified that Manatt, Sr. had taken him to the crossing several times and that his foot had gotten caught in a gap between the crosstie and the rail. Richard Emert, manager of a funeral home and deputy coroner, testified that in October or November of 1993 he went to the crossing and his foot also got caught in a gap. Because of the mark on the pants, the broken leg, and the location of the body after the accident, Emert agreed with Manatt that Scott's foot must have gotten caught in the gap. On cross-examination, Emert stated that except for a six-hour seminar, he had no education, training or experience in accident reconstruction, that the state police had investigated the accident, that this was the first time he had investigated an accident scene in connection with a civil suit, and that he had not consulted any written material or physicians in arriving at his

conclusion.  Emert also stated that he was unaware of the size or type of Scott's shoes, but was aware that both of Scott's shoes were on his feet after the accident and there was no trauma to the ankles.  In addition, Dr. Michael Lack, Scott's physician, testified that the toxicology report indicated that Scott had taken certain drugs, but believed that the drugs could have been prescription drugs, such as pain or cold medications.  Dr. Lack testified it was difficult to determine whether the drugs had impaired Scott's mental status.

On appeal, the Manatts first argue that the district court erred in denying their motion to treat a request for admission as admitted because Amtrak filed its answer beyond the thirty days provided by Fed. R. Civ. P. 36(a).  The request read as follows: "The Amtrak engineer saw Scott Manatt, Jr. with his hands on the rail trying to extricate his foot from its entrapped position with the rail immediately prior to impact."  They are correct in asserting that Rule 36(a) provides that "each matter requested is deemed admitted unless the responding party serves a written answer or objection within 30 days."  Gutting v. Falstaff Brewing Corp., 710 F.2d 1309, 1312 (8th Cir. 1983).  However, "[b]ecause the district court has the power to allow a longer time, . . . the court, in its discretion, may permit the filing of an answer that would be otherwise untimely."  Id. Therefore, contrary to their argument, "the failure to respond in a timely fashion does not require the court automatically to deem all matters admitted."  Id.

In reviewing for an abuse of  discretion, we consider "the effect upon the litigation and prejudice to the resisting party."  Federal Deposit Ins. Corp. v. Prusia, 18 F.3d 637, 640 (8th Cir. 1994) (internal quotation omitted).  Here, the district court did not abuse its discretion.  Refusing the late answer would not have "subserved the presentation of the merits" of Amtrak's defense.  Cf. id. (amendment of admission permitted "[b]ecause allowing the erroneous admission to stand might  have barred [] claim").  In the circumstances of this case, "[t]he prospect of deeming [the] controverted fact[] . . . as having been admitted seems . . . to be anathema to the

-4-

ascertainment of the truth." White Consol. Indus., Inc. v. Waterhouse, 158 F.R.D. 429, 433 (D. Minn. 1994). In addition, the Manatts have not established prejudice, which in this context means " 'the difficulty a party may face in proving its case because of the sudden need to obtain evidence.' " Prusia, 18 F.3d at 640 (quoting Falstaff, 710 F.2d at 1314). In fact, they do not even allege prejudice and "[t]he necessity of having to convince the trier of fact of the truth of the matter erroneously admitted is not sufficient." Id.

The Manatts also argue that the district court abused its discretion by allowing testimony concerning Scott's drug use and depression, asserting that the evidence was inadmissible under Fed. R. Evid. 404(b). The rule provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith[,]" but "is admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Although we believe that the evidence would have been admissible under Rule 404(b), we agree with Amtrak and UP that the court did not admit the evidence under Rule 404(b), but properly admitted it as relevant evidence under Fed. R. Evid. 401 and 402. "[T]he cause of the initial accident [wa]s directly in issue, and the extent of [Scott's impairment] is evidence that clearly bears on the accident's cause." Swajian v. General Motors Corp., 916 F.2d 31, 35 (1st Cir. 1990).

The Manatts go on to argue that even if the evidence was admissible under Rules 401, 402, or 404(b), the district court should have excluded it under Fed. R. Evid. 403, which provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Their argument is without merit. Although the evidence of Scott's drug use and suicidal thoughts "was no doubt prejudicial," it is well settled that "Rule 403 is concerned only with 'unfair prejudice,' that is, 'an undue tendency to suggest decision on an improper basis.' " United States v. Yellow, 18 F.3d 1438, 1442 (8th Cir. 1994) (quoting Rule 403, Adv. Comm. Note). In this case, the evidence did not " 'divert the jury's attention from the

material issues in the trial.' " Id. (quoting United States v. Fawbush, 900 F.2d 150, 152 (8th Cir. 1990)). Moreover, the district court was careful to confine the testimony to general questions concerning the two weeks preceding the accident. See id. Nor, as the Manatts argue, did the district court err in admitting the autopsy blood test results. See, e.g., McVay v. State, 847 S.W.2d 28, 32 (Ark. 1993) ("a blood test result [i]s not to be considered a confidential communication").

In addition, the district court did not err in refusing the Manatts' proffered jury instructions. The court correctly refused to submit an instruction for an abnormally dangerous crossing in that there was no evidence that the crossing was "dangerous because of some physical hazard or visual obstruction" or that the "volume of both train and vehicular traffic render[ed] the [crossing] abnormally dangerous." Missouri Pacific R.R. Co. v. Biddle, 732 S.W.2d 473, 475 (Ark.), modified on other grounds, 737 S.W.2d 625 (1987); see also Shibley v. St. Louis-San Francisco Ry., 533 F.2d 1057, 1063-64 (8th Cir. 1976). The district court also properly refused to instruct the jury that Scott "had a right to be on a public crossing . . . whatever his purpose." As the court noted, the proposed instruction in effect required the jury to find that Scott was on the crossing, but the evidence was in dispute as to whether he was on the crossing or ten to twenty feet south of the crossing.

The Manatts also argue that the district court erred in denying their motion for a new trial, asserting primarily that the verdict was against the weight of the evidence. "The authority to grant or deny a new trial is a matter within the district court's discretion and is not to be reversed absent a clear abuse of discretion." Wood v. Minnesota Mining & Mfg. Co., 112 F.3d 306, 311 (8th Cir. 1997). "Where, as here, the 'basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal.' " Id. (quoting Keenan v. Computer Assoc. Int'l, Inc., 13 F.3d 1266, 1269 (8th Cir. 1994)). Although the Manatts contend that Gearhart was not a credible witness, it was up to the jury to assess his credibility. The jury was fully aware that he had

taken drugs the night of the accident and had pleaded no contest to robbing Scott's body after the accident.  Indeed, Amtrak and UP told the jury in opening statement that Gearhart was a "distasteful individual."  However, Gearhart's "distastefulness" did not make him unworthy of belief.  As Amtrak and UP note, among other things, Gearhart's testimony concerning Scott's drug use was corroborated by the toxicology report, and his testimony that Scott was sitting on the tracks covered by a sheet was corroborated by Wilder's testimony.

The Manatts raise various other arguments.  We have reviewed them and they are without merit.

Accordingly, we affirm the district court's judgment.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.